[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 5, 2005
THOMAS  K. KAHN
CLERK

_____

No. 05-11897
Non-Argument Calendar
_____

D. C. Docket No. 03-01771-CV-T-17-TBM

ALVIN ECKERT,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(October 5, 2005)**

Before TJOFLAT, ANDERSON and BIRCH, Circuit Judges.

PER CURIAM:

Alvin Eckert appeals the district court's order affirming the denial of his

applications for disability insurance benefits, 42 U.S.C. § 405(g), and supplemental security income, 42 U.S.C. § 1383(c)(3). We AFFIRM.

## I. BACKGROUND

Alvin Eckert filed applications for disability insurance benefits and supplemental security income. His applications were denied initially and upon reconsideration. Eckert requested and was granted a hearing before an Administrative Law Judge ("ALJ").

During the hearing, Eckert testified that he was forty-five years old, had a ninth-grade education, could read, write, and speak English, and was qualified to drive a eighteen-wheel truck. He previously worked as a tire vulcanizer (tire repair) and a tractor-trailer driver. He was injured twice while he was working as a driver, once in August 1990, and once in January or February 1990. Administrative Record ("AR") at 60.

Eckert testified that he was having lower back pain that was stabbing and burning, and aches in his knees and toes. Id. at 82. Stooping, bending and crawling caused him pain. Id. at 84. He could sit for about one hour before alternating positions, stand for about fifteen minutes, walk a block and a half, and lift ten pounds. Id. at 83-84. During a typical day, he spent most of his time lying on the couch, he did not do any cooking or household chores, and only drove once

2

a week when necessary. The farthest he had driven in the six years prior to the hearing was 155 miles one way to Tampa, which he had done about eight times. Id. at 81.

Except for two visits to the emergency room, he had not sought medical treatment since August 1994, because he did not have the money to see a doctor. In the three years prior to the hearing, he did not take any prescription medication for his back pain, but he did take Tylenol.

The medical evidence showed that, prior to January 1990, Eckert was being treated by Dr. Daniel Pia, a chiropractor, concerning a back injury in 1987. Dr. Pia diagnosed Eckert with severe lumbosacral (low back) sprain, with resultant bilateral sciatic neuritis (inflamation of the hip) and neuralgia (severe nerve pain). Id. at 176-77. Eckert saw Dr. Pia in October 1991, relative to an accident on 4 March 1990, and Dr. Pia found that Eckert had reached maximum medical improvement in connection with the accident.

During March 1992, Eckert, complaining of back pain, was evaluated by Dr. George Capanioni, an orthopaedist. The physical examination revealed that Eckert was in no obvious distress, had minimal tenderness to deep palpation of his back, minimal paravertebral muscle spasm, and limited range of motion. Id. at 165. Dr. Companioni reviewed X-rays from 1990 which showed no significant

abnormalities. Id. at 166. He reviewed a MRI from May 1990, and found a degenerative disc present at L4/5 and 5/5, and a bulging disc at 4/5. Id. He also reviewed a myelogram, concluded that there was no significant pressure on Eckert's spinal cord, and found that Eckert had only mild degenerative changes. Id. He expressed surprise that Eckert had only been able to work three months between 1990 and 1992 because he concluded that he should have been able to return to work status. Id.

In April 1992, Dr. Pia performed a disability evaluation on Eckert. He found that, when engaged in work activities, Eckert could stand, sit, and walk for no more than fifteen minutes, lift no more than ten pounds, push or pull no more than twenty-five pounds, and could not bend, stoop, squat, turn, twist, kneel, reach, grasp or manipulate small objects, or climb more than five stairs. Id. at 167. He determined that Eckert had a "permanent whole person impairment of 35%, based on AMA guidelines" and concluded found that Eckert was impaired in performing any type of work that was not sedentary or semi-sedentary. Id.

In October of 1992, Dr. John A. Arlington performed an MRI of Eckert's lumbar spine, which showed moderate stenosis (narrowing) at L4-5 and mild to moderate stenosis at L3-4, secondary to a combination of bulging annulus (outer layer of the spinal disk), bilateral ligamentous, and facet hypertrophy (increase in

4

size of facet joints).  Id. at 196.  Also in October 1992, Eckert was treated by Dr. Gene A. Balis, a neurosurgeon.   Dr. Balis found that Eckert had normal strength, symmetric reflexes, and normal sensation.  Id. at 211.  He reviewed Eckert's CT from 1987 and MRI from 1990 and concluded that the MRI showed spinal stenosis at L4-5, mild to moderate stenosis at L3-4, and a bulge at L4-5.  Id. at 211-13.  He felt that Eckert could return to employment at "light duty," with no heavy lifting, straining, stooping, bending, or crawling.  Id. at 211.

On 13 November 1992, Eckert, complaining of back pain, saw Dr. Mary Ann Uranowski, a chiropractor, on an emergency basis.  Id. at 72, 197.  She found that he was sore and tender at L5-S1.  Id. at 197.  She diagnosed Eckert with acute lumbar sprain secondary to lumbar spinal stenosis.  Id.   On 21 December 1992, Eckert went to the emergency room complaining of low back pain.  Id. at 198.  The physical examination showed no specific point tenderness in his back, minor degenerative spurs (bony overgrowth) in the lumbar spine, no significant interspace narrowing, no fracture, and the x-ray of the lumbar spine was negative. Id. at 204, 206.  The diagnosis was low back strain and history of back disorder. Id. at 205.

In January 1993, Dr. Balis, a neurosurgeon, examined Eckert and found him to have normal strength, symmetric reflexes, and normal sensation distally in the

5

lower extremities.  Id. at 210.  He recommended that Eckert seek vocational rehabilitation.   He also noted that the chances of significant improvement were "very thin" because Eckert had already had a long course of conservative therapy. Id.  On 10 August 1994, Eckert went to the emergency room complaining of a fall and back pain.  Id. at 223-24.  He was diagnosed with lumbar strain and treated with an injection that decreased the pain.  Id. at 223, 225.

Robert Whitford, a licensed mental-health counselor, treated Eckert in psychotherapy from July 1989 until November 1993,  after Eckert was ordered by the court to seek treatment because he had molested his daughter.  Id. at 73, 262. This treatment was unrelated to the subject disability claim.   Mr. Whitford found that, during the entire period of treatment, Eckert was moderately anxious and depressed, and that his condition was directly related to his reported chronic back problems.  Id. at 262.

In December 1995, Eckert, complaining of low back pain, burning, numbness of the groin, aching knees and numbness and tingling of his toes, saw Dr. Uranowski.  Id. at 245.  Contained in her records were a physical capacities evaluation and a medical impairment evaluation finding that Eckert had spinal stenosis aggravated by bending, lifting, prolonged standing, and walking, and that, in an eight-hour day, Eckert was able to sit for one hour, stand thirty minutes, not

6

walk at all, and lift five pounds continuously, ten pounds occasionally, and twenty pounds occasionally. Eckert was found to be able to perform simple grasping, reaching, pushing, pulling, and fine manipulating, but he should never bend, squat, kneel, crawl, or work in areas where there were unprotected heights, moving machinery, noise and vibration, and extreme temperatures. Id. at 236-38. He found that Eckert was able to perform "sedentary work," defined as work that requires lifting a maximum of ten pounds, occasionally carrying files, ledgers, small tools, and similar objects, and walking and standing occasionally. Id. at 238.

In April 1996, Dr. James Fesler, a psychologist, diagnosed Eckert with dysthymia (type of depression) compounded by chronic pain. Id. at 279-80. He described the dysthymia as "of a mild nature" and found that, combined with the pain and depression, it had resulted in social withdrawal and would give Eckert some difficulty maintaining concentration over an extended period of time or persisting in tasks. Id. at 282-83.

A vocational expert ("VE") testified during the hearing that, based on Eckert's previous jobs, he might have garnered certain skills that are transferable to less demanding types of work, such as maintaining a driver log in accordance with regulations, machine and hand-tool usage, and lower level bookkeeping. Id. at 93. The ALJ gave the VE a series of three hypotheticals and then asked the VE to state

if such an individual could perform Eckert's past relevant work, and, if not, what type of work he could perform. In the first hypothetical, the worker was under age fifty, had education and past relevant work experience like Eckert's, and, during an eight-hour day, he could sit for six hours off and on, stand or walk for two hours, lift ten pounds occasionally and five pounds frequently, and could do occasional bending for up to one-third of the workday. The VE stated that such a person could not perform any of his previous relevant work, but could perform sedentary positions. Id. at 94. The jobs available to this type of person would be a surveillance system monitor, a carding machine operator, an ink printer, a stuffer, and a leaf tier. Id. at 94-96.

In the second hypothetical, the information was the same as in the first, except the worker could lift twenty pounds occasionally and ten pounds frequently. This person could not return to his past relevant work, but could, in addition to the jobs listed in the first hypothetical, perform the work of a checker, a photocopy-machine operator, and a carver in the food-service industry. Id. at 96-97. For the third hypothetical, the information was the same as the first, but the worker could sit for only four hours and stand and walk for four hours during an eight-hour day. This person could not do their past relevant work but could work as a surveillance system monitor, leaf tier, stuffer, and ink printer. Id. at 98.

8

Eckert's counsel proposed a hypothetical that in addition to the first and third hypotheticals proposed by the ALJ, the worker was incapable of bending, stooping, squatting, crawling, and kneeling. The VE stated that this additional information would not change his previous answers. Eckert's counsel then proposed a hypothetical that in addition to the information in the ALJ's first hypothetical, the worker could never engage in work involving moving machinery or noises and vibration. The VE stated that the only jobs available to this person would be ink printer and surveillance system monitor. Id. at 100.

The ALJ determined that Eckert was not entitled to Social Security disability insurance benefits or supplemental security income. Id. at 41. The Appeals Counsel denied review. Upon judicial review, the district court vacated and remanded the case on the Commissioner's request in order to update the record.

A supplemental hearing was held on 12 February 2002. Eckert, then fifty-one years old, testified substantially as he had at the first hearing, and, in addition, testified that during the time after his two 1990 accidents, he was having mental problems and was depressed. Id. at 414. From the time he stopped working in 1990, until March 1994, the farthest that he could walk was 500 feet, he could stand for fifteen minutes, sit for twenty minutes without changing positions, and lift only ten pounds. Id. at 426-27. At the time of the supplemental hearing, he

9

could walk 250-300 feet, and he used a cane.  Id. at 427.  When he drove to Tampa, he had to stop every thirty minutes of the 360-mile trip.  Id. at 429-30.

The medical evidence admitted at the supplemental hearing showed that, from 20 October 1998 to 22 February 2000, Eckert was regularly treated by Dr. Philip Springer at a psychiatry and pain-management center.  Id. at 496-555.  Eckert saw Dr. Springer on average once or twice a month during this period.  The majority of Dr. Springer's evaluations contained the assessment that Eckert's pain was still a significant problem, but that he had reached partial control with the aid of medication, and that he was not in need of more intense psychiatric intervention.  The only assessments to deviate were in November 1998 and April 1999, when Dr. Springer noted that Eckert was in need of psychiatric treatment that could be performed on an outpatient basis.  Id. at 546, 548, 550.

On 17 October 2000, Candace Valenstein, a clinical psychologist, administered the Personality Assessment Inventory to Eckert.  The results showed that Eckert had significant thinking and concentration problems accompanied by "prominent distress and dysphoria" (anxiety), and that he was also "clinically depressed, discouraged, and withdrawn."  Id. at 557.  Her records reveal that Eckert reported smoking an average of two packs of cigarettes a day.

A VE testified and the ALJ proposed the hypothetical that an individual was

forty-three years old, with education and past relevant work experience similar to Eckert's, could sit for six hours and stand and walk for two hours during an eight-hour day, could lift twenty pounds on occasion and ten pounds more frequently and could do occasional bending, stooping, and squatting, but no crawling or climbing, and should not work in dangerous, unprotected heights. The VE stated that this person could not return to his past relevant work but could work a sedentary job such as a garment inspector, a carding machine operator, stringing machine tender, surveillance systems monitor, and dispatcher. Id. at 467-468.

In the second hypothetical, the information remained the same, except the worker could stand, walk, and sit for only four hours a day, must be allowed to alternate their position every fifteen to thirty minutes, and could have only occasional contact with members of the general public, coworkers, and supervisors. The VE stated that this person could perform all of the jobs he had listed under the first hypothetical, except for dispatcher. Id. at 470. For the third hypothetical, all of the information in the second stayed the same, except the person could stand and walk six hours and sit for two hours a day. The VE stated that his response to the second hypothetical would still apply, and he would add box-sealer inspector and paper-comb-machine tender to the list of jobs that the person could perform. Id. at 471.

Eckert's attorney proposed the hypothetical that in all of the three previous situations discussed, the person also had no real ability to perform activities within a schedule, maintain regular attendance, or be punctual. The VE stated that this person would not be able to perform any of the jobs that he had previously listed. Id. 472-74.

After reviewing the medical evidence, the ALJ found that Eckert had severe impairments of low back pain, degenerative disc disease, and mild dysthymic disorder, but that the impairments did not meet the criteria of any of the impairments listed in the listings of impairments. Id. at 329. The ALJ gave less weight to the findings of the chiropractor, Dr. Uranowski, and more weight to the findings of the neurosurgeon, Dr. Balis, and the orthopedist, Dr. Companioni, who found that Eckert could go back to gainful employment. Id. at 320. Mr. Whitford's opinion was given no credit because Eckert saw him under a court order unrelated to his disability.

The ALJ also discredited Dr. Fesler's opinion that Eckert had a listing-level disorder because Eckert testified at the hearing that he did not believe he needed to see a psychiatrist or other mental health professional, yet he told Dr. Fesler he had been chronically depressed after his back injury. The ALJ discredited Dr. Springer's opinions because his progress notes were internally inconsistent

12

regarding Eckert's mental health, and because Dr. Springer was not a psychiatrist or qualified to give an opinion on Eckert's mental status.  Id. at 321-22.  The ALJ discredited Dr. Valenstein's report with respect to Eckert's ability to perform certain work activities because her report was inconsistent with the totality of the medical evidence and because certain statements in her report were inconsistent with her other findings.  Id. at 325.

The ALJ concluded that Eckert was unable to perform his past relevant work but that he retained the residual functional capacity to engage in sedentary and light work activities.  Id. at 324.  The ALJ found that Eckert was a "person closely approaching advanced age" with a limited education and semi-skilled work experience, and that, although "he is unable to perform the full range of light and sedentary work, he is capable of making an adjustment to work which exists in significant numbers in the national economy," such as "surveillance system monitor, carding machine operator, ink printer, stuffer, and leaf tier."  Id. at 329, 330.

The ALJ found that Eckert's statements regarding the impact of his impairments on his ability to work were not entirely credible and were inconsistent with the objective medical evidence.  Id. at 327, 329.  The ALJ gave weight to Dr. Balis and Dr. Companioni's opinions that Eckert could return to work despite his

13

physical limitations. The ALJ concluded that Eckert was not disabled at any time prior to the expiration of his insured status or the ALJ's decision. Id. at 330. The Appeals Counsel denied review. The district court affirmed the ALJ's decision.

## II. DISCUSSION

Eckert argues on appeal that the ALJ's findings on his credibility regarding the extent of his pain were not supported by substantial evidence. Specifically, he argues that the objective medical evidence corroborates his testimony concerning his severe and debilitating pain during the relevant period and that the ALJ failed to incorporate in his decision the findings of the neurosurgeon, Dr. Balis, that Eckert had mild to moderate stenosis and a bulge at L4-5, failed to incorporate the findings of the mental heath counselor, Mr. Whitford, that he is not the type of person predisposed to lie or complain unless there is something wrong, and failed to incorporate the findings of clinical psychologist Dr. Valenstein that he did not attempt to present an unrealistic impression of himself. Finally, he argues that the ALJ mischaracterized his testimony by leaving out the fact that, although he has been able to drive 180 miles to Tampa, he has to stop every thirty minutes, and the trip takes him five to six hours.

We review the Commissioner's decision to determine if it is supported by substantial evidence and whether the correct legal standards were applied. Ellison

14

v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam). "'Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" Id. (citation omitted). When evaluating a claimant's subjective complaints of pain, "[t]he pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam). Credibility determinations are for the ALJ. Hudson v. Heckler, 755 F.2d 781, 784 (11th Cir. 1985) (per curiam). If an ALJ rejects a claimant's testimony regarding pain, he must articulate specific reasons. Allen v. Sullivan, 880 F.2d 1200, 1202-03 (11th Cir. 1989) (per curiam).

In this case, there was evidence of an underlying medical condition. As found by the ALJ, the medical evidence showed that Eckert had low back pain and degenerative disc disease at L3-L5. Several of the treating physicians concluded in their reports that Eckert had stenosis or degeneration in his spine and that Eckert complained of back pain. The ALJ found, however, that the objective evidence did not support Eckert's allegations as to the extent the pain prevented him from

working. Eckert testified that during the relevant time period he could only walk 500 feet, stand for fifteen minutes and sit for twenty minutes without changing positions and lift only ten pounds. He also testified that during a typical day he was not able to do much except lie on a couch. This testimony was inconsistent with the medical evidence showing that his stenosis was mild or moderate, his pain could be partially controlled with medication, and he could perform such activities as carrying objects that weighed less than ten pounds, simple grasping, pushing, or pulling, and could do occasional walking and standing while at work.

After giving specific reasons for rejecting the contradictory medical evidence, the ALJ accepted the opinions of the treating neurosurgeon, Dr. Balis, and the treating orthopedist, Dr. Capanioni, who both found that Eckert had only mild or moderate degeneration of his spine and should be able to return to work. See Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Nov. 1981) (holding that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion"). Thus, the credible medical evidence, as found by the ALJ, did not confirm the severity of the alleged pain and the objectively determined medical condition was not of such a severity that it can reasonably be expected to give rise to the alleged pain.

In contrast to Eckert's assertions, the ALJ's decision did not omit or

mischaracterize the evidence regarding Eckert's credibility. In finding that Eckert had the ability for sustained concentration, the ALJ noted that he testified that he was able to drive a car 180 miles to Tampa. Although, as Eckert explains, the ALJ did not discuss the fact that Eckert also testified that it takes him six hours to complete the trip and that he must stop at every rest stop, this testimony does not refute the ALJ's findings that Eckert can sustain concentration, regardless of how long he can drive continuously. It is also irrelevant whether the ALJ considered Mr. Whitford's and Dr. Valenstein's opinions on whether Eckert misrepresented his medical condition, because the ALJ is the judge of a claimant's credibility. These professionals' opinions on Eckert's truthfulness do not support a finding that the objective medical evidence confirms a condition that causes debilitating pain, and regardless, the ALJ did consider and discredit the opinions of both Mr. Whitford and Dr. Valenstein.

The ALJ found that Eckert suffers from low back pain and degenerative disc disease. The ALJ also correctly found, supported by substantial evidence, that the objective medical evidence does not confirm the severity of the alleged pain arising from Eckert's condition nor, is the objectively determined medical condition of such a severity that it can be reasonably expected to give rise to the alleged disabling pain. Additionally, the ALJ did not omit relevant medical evidence or

17

mischaracterize the medical evidence as alleged by Eckert on appeal. The ALJ's decision, rejecting Eckert's credibility with respect to his subjective complaints of pain, and finding that Eckert's medical impairments did not prevent him from performing some types of unskilled work, is supported by substantial evidence.

## III. CONCLUSION

Eckert has appealed the district court's affirming denial of his applications for disability insurance benefits and supplemental security income. As we have explained herein, the ALJ's decision concerning denial of these benefits is supported by substantial evidence. Accordingly, the district court's affirming denial of benefits to Eckert is **AFFIRMED.**